775 So.2d 184 (2000)
SouthTRUST BANK, National Association
v.
Mark WILLIAMS and Bessie Daniels.
1980706.
Supreme Court of Alabama.
July 21, 2000.
*185 J. Michael Druhan, Jr., and James C. Johnston of Johnston, Wilkins & Druhan, L.L.P., Mobile; and Stewart M. Cox and Matthew A. Aiken of Bradley, Arant, Rose & White, L.L.P., Birmingham, for appellant.
Robert T. Cunningham, Jr., Richard T. Dorman, David G. Wirtes, Jr., and George M. Dent III of Cunningham, Bounds, Yance, Crowder & Brown, L.L.C., Mobile, for appellees.
COOK, Justice.
SouthTrust Bank, National Association ("SouthTrust"), appeals from an order denying its motion to compel arbitration of an action against it by checking-account customers Mark Williams and Bessie Daniels. Williams and Daniels are the named representatives in a putative class action against SouthTrust. We reverse and remand.
Daniels and Williams began their relationship with SouthTrust in 1981 and 1995, respectively, by executing checking-account "signature cards." The signature card each customer signed contained a "change-in-terms" clause. Specifically, when Daniels signed her signature card, she "agree[d] to be subject to the Rules and Regulations as may now or hereafter be adopted by the Bank." (Emphasis added.) The rules and regulations referred to on the signature card were internal rules adopted by SouthTrust (hereinafter referred to as the "regulations"). The regulations in effect when Daniels signed the signature card provided: "These Rules and Regulations, or any part thereof, may be amended, altered, changed, added to or repealed, and others adopted in their place by Bank, and any such amendment, alteration, change, addition or repeal shall be binding upon all depositors as fully as though expressly assented to by them."
Thereafter, SouthTrust periodically amended its regulations. In 1993, it amended the regulations by adding paragraph 15, also a change-in-terms clause. Paragraph 15 provided, in part:

"We may amend the [regulations] from time to time. Each such amendment will be effective upon notice to you given as provided in this paragraph. With respect to any term in these [Regulations] that is required to be disclosed under Regulation DD, we may change any such term in a manner that is adverse to you upon not less than 30-days notice to you given in accordance with the requirements of federal regulations. Other changes to these [regulations] will be effective upon notice to you given by our either posting the amendment or the amended [regulations] in our manned *186 offices where deposits are received for not less than 10 calendar days prior to the effective date of the amendment or mailing or otherwise delivering a copy of the amendment or the amended [regulations] to you not later than 10 days prior to the effective date of such amendment."
(Emphasis added.)
The signature card Williams signed provided:
"I/We acknowledge receipt of a copy of the Bank's Rules and Regulations Governing Deposit Accounts and its Schedule of Services and Service Charges.... I/We agree to be bound by such Regulations and Schedule and all amendments made to either of them from time to time upon notice to any one of the persons signing below, each of whom is hereby designated as agent for the others in connection with all matters concerning this account."
(Emphasis added.) Because Williams's account was opened in 1995, it was subject to paragraph 15 of the regulations, which was added in 1993.
By further amendment effective March 3, 1997, SouthTrust added paragraph 33 to the regulations. That paragraph provides, in pertinent part:
"ARBITRATION OF DISPUTES. You and we agree that the transactions in your account involve `commerce' under the Federal Arbitration Act (`FAA'). ANY CONTROVERSY OR CLAIM BETWEEN YOU AND US, OR BETWEEN YOU AND ANY OF OUR OFFICERS, EMPLOYEES, AGENTS OR AFFILIATED ENTITIES, THAT ARISES OUT OF OR IS RELATED TO YOUR ACCOUNT, OR ANY SERVICE RELATED TO YOUR ACCOUNT, OR ANY AGREEMENT RELATED TO YOUR ACCOUNT OR ANY SUCH SERVICE, WHETHER BASED ON CONTRACT OR IN TORT OR ANY OTHER LEGAL THEORY, INCLUDING CLAIMS OF FRAUD, SUPPRESSION, MISREPRESENTATION AND FRAUD IN THE INDUCEMENT (COLLECTIVELY, ANY `CLAIM'), WILL BE SETTLED BY BINDING ARBITRATION UNDER THE FAA. The arbitration will be administered by the American Arbitration Association under its Commercial Arbitration Rules (`the Arbitration Rules').... This agreement to arbitrate disputes will survive the closing of your account and the termination of your deposit agreement with us."
(Capital letters and boldface in original.)
This action, commenced on July 28, 1998, challenges SouthTrust's procedures for paying overdrafts, and alleges that SouthTrust engages in a "uniform practice of paying the largest check(s) before paying multiple smaller checks ... [in order] to generate increased service charges for [SouthTrust] at the expense of [its customers]."[1]
SouthTrust filed a "motion to stay [the] lawsuit and to compel arbitration." It based its motion on paragraph 33 of the regulations. On January 7, 1999, the trial court, without making any findings of fact or stating any conclusions of law, entered an order denying SouthTrust's motion to compel arbitration. SouthTrust appeals from that order.
SouthTrust insists that "`[t]his Court is required [by the Federal Arbitration Act, 9 U.S.C. § 1, et seq.], to compel arbitration if, under "ordinary state-law principles that govern the formation of contracts," the contract containing the arbitration clause is enforceable.'" Brief of Appellant, at 13 (quoting Quality Truck & *187 Auto Sales, Inc. v. Yassine, 730 So.2d 1164, 1167 (Ala.1999)). SouthTrust further contends that it has contracts with Williams and with Daniels that contain an arbitration clause enforceable "under ordinary state-law principles."
Williams and Daniels contend that SouthTrust's amendment to the regulations, adding paragraph 33, was ineffective because, they say, they did not expressly assent to the amendment. In other words, they object to submitting their claims to arbitration because, they say, when they opened their accounts, neither the regulations nor any other relevant document contained an arbitration provision. They argue that "mere failure to object to the addition of a material term cannot be construed as an acceptance of it." Brief of Appellees, at 4. They contend that South-Trust could not unilaterally insert an arbitration clause in the regulations and making it binding on depositors like them.
SouthTrust, however, referring to its change-of-terms clauses, insists that it "notified" Daniels and Williams of the amendment in January 1997 by enclosing in each customer's "account statement" a complete copy of the regulations, as amended. Although it is undisputed that Daniels and Williams never affirmatively assented to these amended regulations, SouthTrust contends that their assent was evidenced by their failure to close their accounts after they received notice of the amendments. Moreover, SouthTrust argues, the regulations in force when both Daniels and Williams opened their respective accounts expressly allowed periodic amendments to the regulations. Thus, SouthTrust insists, "[t]he [initial checking-account] agreement itself, at the time it [was] signed by the depositor, expressly anticipate[d] that the Rules and Regulations may be amended by the Bank and that continued use of the account (not any signature) is the manifestation of the depositor's assent to the amendment." Brief of Appellant, at 20-21 (emphasis added). Thus, the disposition of this case turns on the legal effect of Williams and Daniels's continued use of the accounts after the regulations were amended.
Williams and Daniels argue that "[i]n the context of contracts between merchants, a written confirmation of an acceptance may modify the contract unless it adds a material term, and arbitration clauses are material terms." Brief of Appellees, at 5 (emphasis added; some capitalization omitted). They analogize the procedure by which SouthTrust amended its regulations to transactions to which Ala.Code 1975, § 7-2-207, is applicable. Section 7-2-207 provides, in pertinent part:
"(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon ....
"(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
". . . .
"(b) They materially alter it; or
"(c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received."
(Emphasis added.)
Williams and Daniels concedeas they mustthat § 7-2-207 is included in Article 2 of Ala.Code 1975, entitled "Sales." They also concede that that Article governs "transactions in goods," § 7-2-102, and, consequently, that it is not applicable to the transactions in this case. Nevertheless, they argue:
"It would be astonishing if a Court were to consider the addition of an arbitration clause a material alteration to a contract between merchants, who by definition are sophisticated in the trade to which the contract applies, but not hold that *188 the addition of an arbitration clause is a material alteration pursuant to a change-of-terms clause in a contract between one sophisticated party, a bank, and an entire class of less sophisticated parties, its depositors."
Brief of Appellees, at 9 (emphasis in original; footnote omitted).
In response, SouthTrust states that "because of the `at-will' nature of the relationship, banks by necessity must contractually reserve the right to amend their deposit agreements from time to time." Brief of Appellant, at 16. In so stating, South-Trust has precisely identified the fundamental difference between the transactions here and those transactions governed by § 7-2-207.
Contracts for the purchase and sale of goods are essentially bilateral and executory in nature. See Stumpf v. Richardson, 748 So.2d 1225, 1227 (La.Ct.App. 1999) ("An agreement whereby one party promises to sell and the other promises to buy a thing at a later time ... is a bilateral promise of sale or contract to sell"). "[A] unilateral contract results from an exchange of a promise for an act; a bilateral contract results from an exchange of promises." Mark Pettit, Jr., Modern Unilateral Contracts, 63 B.U.L.Rev. 551, 553 (1983). Thus, "in a unilateral contract, there is no bargaining process or exchange of promises by parties as in a bilateral contract." Orr v. Westminster Village North, Inc., 689 N.E.2d 712, 720 n. 11 (Ind.1997). "[O]nly one party makes an offer (or promise) which invites performance by another, and performance constitutes both acceptance of that offer and consideration." Id. Because "a `unilateral contract' is one in which no promisor receives promise as consideration for his promise," only one party is bound. Johns v. Thomas H. Vaughn & Co., 34 Ala.App. 99, 101, 38 So.2d 19, 20 (1948). The difference is not one of semantics but of substance; it determines the rights and responsibilities of the parties, including the time and the conditions under which a cause of action accrues for a breach of the contract.[2]
This case involves at-will, commercial relationships, based upon a series of unilateral transactions. Thus, it is more analogous to cases involving insurance policies, such as Woodmen of the World v. Harris, 740 So.2d 362 (Ala.1999), and Ex parte Rager, 712 So.2d 333 (Ala.1998).[3] The common thread running through those cases was the amendment by one of the parties to a business relationship of a document underlying that relationshipwithout the express assent of the other party to require the arbitration of disputes arising after the amendment.
In Harris, Woodmen of the World Life Insurance Society ("Woodmen"), the insurer, sought to compel the arbitration of an action against it by its insured, Larry Harris. "After Harris became a member of Woodmen, but before he filed his action, Woodmen amended its constitution" to require the arbitration of disputes such as Harris's. 740 So.2d at 363. Harris contended "that he did not learn about the *189 [arbitration] provision until after he had filed his action." Id. at 365 n. 6. In holding that the dispute was arbitrable, this Court said:
"When Harris purchased insurance from Woodmen, he agreed to be bound by all of the documents expressly incorporated into the certificate, specifically the Woodmen constitution and any amendments to that constitution. The certificate states that `[t]he Articles of Incorporation and the Constitution and laws and any amendments to them are binding on the member.' The arbitration provision was duly adopted by an amendment of the kind that Harris agreed to be bound by when he joined Woodmen. Although Harris may not have expressly assented to the particular arbitration provision at issue here, it appears to be undisputed that he did assent to the plain terms of the certificate, which, at the time he entered into the contract with Woodmen, included a provision allowing for future amendments to the constitution."
740 So.2d at 367. (Emphasis added.) See also Woodmen of the World v. White, 35 F.Supp.2d 1349 (M.D.Ala.1999).
A similar issue was presented in Rager. In Rager, Jonathan Rager and Bessie Armistead sued Liberty National Insurance Company ("Liberty National"), alleging that Liberty National had denied coverage under a "hospital accident policy." 712 So.2d at 334. Liberty National sought to compel arbitration of the dispute, based upon a provision in the policy it had delivered to Rager and Armistead. Rager and Armistead resisted arbitration on the ground that the application for the policy, pursuant to which they had sought insurance, did not contain an arbitration provision. Id. They argued that, although their policy contained an endorsement that included an arbitration clause, they never agreed to arbitrate, because they never signed the endorsement. Liberty National, on the other hand, contended that "the endorsement was a valid portion of the policy, and, therefore, that the arbitration clause should apply." 712 So.2d at 335. This Court "agree[d] with Liberty National." Id.
In doing so, it explained:
"`An application for insurance is an offer to enter into an insurance contract, and if the insurer issues a policy materially different from that applied for, the policy is a counter-offer which becomes binding only when accepted by the applicant.' Connell v. State Farm Mutual Auto. Ins. Co., 482 So.2d 1165, 1167 (Ala.1985). Even if the inclusion of the arbitration provision was a material alteration of the policy applied forand we would say it was notthe petitioners would have accepted the counter-offer by not returning the policy and, instead, paying the premiums on it. Therefore, it does not matter that the application did not mention arbitration."
712 So.2d at 335.[4] See also Ex parte Shelton, 738 So.2d 864, 871 (Ala.1999) ("neither this Court, nor the Alabama Legislature,... can sanction an arbitration-specific limitation, such as a requirement that insurance companies obtain written consent from policyholders before amending an insurance contract through the mail by adding an arbitration provision").
The parties in Harris and Rager, like Williams and Daniels in this case, took no action that could be considered inconsistent with an assent to the arbitration provision. In each case, they continued the business relationship after the interposition of the arbitration provision. In doing so, they implicitly assented to the addition of the arbitration provision.[5]
*190 Indeed, it is precisely this kind of acquiescence that forms the basis for the implicit assent to modification of a credit-card-account term, as set forth in Ala.Code 1975, § 5-20-5. Section 5-20-5 provides, in pertinent part:
"Notwithstanding the provisions of any other law, in connection with a credit card account, any domestic lender or any credit card bank may provide in the credit card agreement ... such ... terms and conditions as such domestic lender or credit card bank and the debtor may agree from time to time.... In the event any domestic lender or credit card bank desires to modify in any respect any term of the credit card account, it shall first provide at least 30 days' prior written notice of such modification to the debtor. In providing such notice, such domestic lender or credit card bank shall advise the debtor in writing that the debtor has the option (i) to surrender the credit card whereupon the debtor shall have the right to continue to pay off the credit card account in the same manner and under the same terms and conditions as then in effect; or (ii) to hold the credit card after the 30-day period has elapsed, or to use the credit card during such period, either of which shall constitute the debtor's consent to the modification."

(Emphasis added.) Thus, in § 5-20-5, the Legislature provided a procedure that differs in no material respect from the one SouthTrust followed in this case. In other words, it expressly provided that original agreement may be amended by the lender, based upon the apparent acquiescence of the cardholder, with or without a change-in-terms clause such as the ones involved in this case.
Section 5-20-5 was cited with approval in Stiles v. Home Cable Concepts, Inc., 994 F.Supp. 1410 (M.D.Ala.1998). The dispute in that case began when Johnny Stiles purchased a "satellite television receiving system." 994 F.Supp. at 1412. To finance the purchase, Stiles completed an application for a "revolving charge account with [American General Financial Center (`AGFC')]," dated March 31, 1994. Id. The application contained a clause purporting to authorize AGFC to "change the terms of [the] Agreement from time to time," upon notice of the proposed changes. Id.
On January 1, 1997, pursuant to this change-in-terms clause, AGFC mailed Stiles a "NOTICE OF CHANGE OF TERMS," which contained an arbitration provision. 994 F.Supp. at 1413 (capital letters in original; boldface omitted). It also stated: "You may elect to reject these changes in terms by completing the attached postage paid postcard and returning it to [AGFC].... If you reject these changes ... there will be no arbitration agreement in effect." Id. (Boldface omitted.) Stiles did not respond to the invitation.
In May 1997, after the effective date of the change of terms, Stiles sued, among others, AGFC, 994 F.Supp. at 1414, and AGFC interposed the arbitration provision. Stiles contended, as do Williams and Daniels in this case, that the arbitration clause was not part of the agreement between the parties. 994 F.Supp. at 1416-17.
The district court rejected Stiles's contention. Noting that "the contract to which Stiles assented [could] be changed by AGFC," the court concluded that Stiles had "assented to [the] arbitration clause, even absent his signature." 994 F.Supp. at 1416. As evidence that the procedure was "[f]ar from being unconscionable," the court cited § 5-20-5, and its Utah counterpart, Utah Code, § 70C-4-102, noting that § 5-20-5 "would apparently permit the change as well."[6] 994 F.Supp. at 1418.
Amendments to the conditions of unilateral-contract relationships with notice of the changed conditions are not inconsistent *191 with the general law of contracts. See Harris and Rager, supra. Federal law prohibits this Court from subjecting arbitration provisions to special scrutiny. Doctor's Assoc., Inc. v. Casarotto, 517 U.S. 681, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). Based on the foregoing,[7] we conclude that Williams and Daniels implicitly assented to be bound by the arbitration provisions by holding open their accounts after notice of the amendment.[8]
We have considered the other arguments Williams and Daniels presented in opposition to the arbitrability of this dispute, and have found them to be without merit. Consequently, the trial court erred in denying SouthTrust's motion to compel arbitration. The order of the trial court is, therefore, reversed, and this cause is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOOPER, C.J., and MADDOX, SEE, LYONS, BROWN, and ENGLAND, JJ., concur.
HOUSTON, J., concurs in the result.
HOUSTON, Justice (concurring in the result).
I have reviewed Powertel, Inc. v. Bexley, 743 So.2d 570 (Fla.Dist.Ct.App.1999), which the appellees cited to the Court by a letter brief dated November 17, 1999. Powertel, however, has no precedential effect on this Court. Even if it did, Powertel is distinguishable because the lawsuit in that case was pending before Powertel attempted to add the disputed arbitration requirement to the parties' agreement.
NOTES
[1] The plaintiffs purport to represent a class of plaintiffs composed of "[a]ll persons ... in... Alabama, Georgia, Tennessee, Florida, Mississippi, North Carolina and South Carolina who have or have had checking accounts with [SouthTrust] and who have incurred checking account service charges when there were sufficient funds in the account... on the date of presentment to pay multiple checks."
[2] A number of courts, for example, do not recognize a cause of action for the anticipatory breach of a unilateral contract. See, e.g., Smyth v. United States, 302 U.S. 329, 58 S.Ct. 248, 82 L.Ed. 294 (1937); Rosenfeld v. City Paper Co., 527 So.2d 704 (Ala.1988); Cobb v. Pacific Mut. Life Ins., 4 Cal.2d 565, 51 P.2d 84 (1935); Garrett v. American Family Mut. Ins., 520 S.W.2d 102 (Mo.Ct.App.1974).
[3] The quintessential example of a unilateral contract is, perhaps, the contract for at-will employment. Ex parte McNaughton, 728 So.2d 592, 603 (Cook, J., dissenting). However, "all forms of insurance are presumed to be unilateral contracts." Winters v. State Farm & Fire Cas. Co., 35 F.Supp.2d 842, 845 (E.D.Okla.1999) (emphasis added). This is so, because, "after the insured has paid the premium, only the insurer is legally bound (by its promises) to do anything." Id. "[Fire insurance] is a reverse unilateral contract in that the applicant's acts of performance induce insurer's promise." Id. (Emphasis added.) See also 5 Walter H.E. Jaeger, Williston on Contracts § 673 (3d ed., 1961) ("A contract of insurance is normally a unilateral contract.").
[4] We reiterate that an offer in the context of a unilateral insurance contract differs materially with different legal consequencesfrom an offer in the context of an executory, bilateral sales contract.
[5] Our discussion of Harris and Rager is limited to the facts that were presented in those cases.
[6] The contract in Stiles provided that it was to be "governed by and interpreted ... in accordance with the laws of the State of Utah." 994 F.Supp. at 1412.
[7] We have not overlooked Marshall v. Nelson, 622 So.2d 889 (Ala.1993), or Badie v. Bank of America, 67 Cal.App.4th 779, 79 Cal.Rptr.2d 273 (1998), cases on which Williams and Daniels rely. However, Marshall is distinguishable; Badie is also distinguishable, and even if it were not it would not be controlling.
[8] Williams and Daniels do not contend that SouthTrust failed to send them notice of the proposed amendment to the regulations.