This is an arbitration case involving a brokerage agreement. The determinative issue is whether the appellant, UBS PaineWebber, Inc. ("PaineWebber"), a brokerage firm, could, after a corporate merger pursuant to which accounts formerly held by J.C. Bradford Co., L.L.C. ("J.C. Bradford"), were transferred to PaineWebber, compel the appellee, E. Walton Brown, a customer of J.C. Bradford, to arbitrate his claims against PaineWebber and Glenn E. Brandon. Brandon was a financial consultant who worked for J.C. Bradford at the time Brown opened his account there, but who was employed by *Page 412 
PaineWebber at the time of the transactions that form the basis for this action.
In his complaint, Brown alleged that Brandon, acting as an agent of PaineWebber, made unauthorized and unsuitable purchases of securities for Brown's account and refused to sell the securities when Brown asked him to do so.
Even though the parties disagree as to whether Brown should be compelled to arbitrate his claims, the record clearly shows that Brown maintained a relationship with PaineWebber even after the motion to compel arbitration was filed, and the law precludes a party from claiming that a defendant owed him or her a duty arising out of a relationship between the parties and at the same time assert that he or she is not bound by the terms of an agreement governing the relationship, which agreement includes an arbitration clause that covers all preexisting disputes. Consequently, we reverse the judgment of the trial court and remand.
 Facts
Brown opened a brokerage account with J.C. Bradford in November 1999. At that time, Brandon was working for J.C. Bradford. J.C. Bradford was subsequently acquired by PaineWebber Group, Inc., the parent company of PaineWebber, in the spring of 2000. In the acquisition, which was closed on June 9, 2000, J.C. Bradford Acquisition Company, an acquisition subsidiary of PaineWebber Group, Inc., merged with J.C. Bradford; J.C. Bradford continued to exist as a limited liability company and became a wholly owned subsidiary of UBS Americas, Inc., which also owns PaineWebber.
The agreement Brown executed when he established his brokerage account with J.C. Bradford contained an arbitration clause, and there was also an arbitration agreement in materials PaineWebber contends it sent to Brown on July 3, 2000, days before the transactions that form the basis for this action.
PaineWebber contends that, as a result of corporate restructuring, it acquired all of the accounts of J.C. Bradford's customers and that it sent Brown two "negative consent" letters notifying him of that fact, as well as a "disclosure brochure" and a master account agreement that contained the arbitration clause PaineWebber contends governs Brown's transactions. Brown makes two basic arguments in support of the trial court's order refusing to compel him to arbitrate: (1) he denied that he received from PaineWebber either a copy of the negative consent letters, the disclosure brochure, or the master account agreement; and (2) that the brokerage agreement entered into between Brown and J.C. Bradford, on which PaineWebber partially relies, was not properly modified in accordance with the terms of that agreement.
One of the central questions presented on this appeal is the applicability of the PaineWebber master account agreement to the transactions underlying this appeal. The PaineWebber master account agreement begins with the following language:
 "Note for J.C. Bradford customers: This Master Account Agreement and the following Account Information section assume that you have executed an Account Application with PaineWebber. Since we are not requiring you to execute any new account documentation as a result of the Conversion, those references and similar references, where applicable, shall mean the original account application and documentation you executed when you established your J.C. Bradford account."
The July 3 letter PaineWebber says it sent Brown contains the following: *Page 413 
 "We encourage you to review [the accompanying] materials closely and to contact your J.C. Bradford Financial Advisor or call (800) 727-2557 with questions. If you do not want to have your account automatically moved to PaineWebber, we request that you make arrangements to transfer your account by August 2, 2000."
(Bold typeface and emphasis original.) A disclosure brochure that accompanied the July 3 account-transfer notice contained a section entitled "General Conversion Information," in which PaineWebber informed Bradford customers as follows:
 "Although you will not be required to execute a new account agreement with PaineWebber, your new account will be controlled by the terms and conditions applicable to all PaineWebber accounts in the respective program (subject to the final sentence of the paragraph). . . .
". . . .
 "If we do not hear otherwise from you before August 8, 2000, and you continue to maintain your account(s) with J.C. Bradford, we will convert your account(s) and you will be deemed to have agreed to all of the changes, terms and conditions described in this Brochure. You may terminate your Agreement with us at any time by notifying us in writing."
(Bold typeface original.) Among the terms and conditions of the PaineWebber master account agreement was a provision calling for mandatory arbitration of "any and all controversies":
 "Client agrees, and by carrying an account for Client [PaineWebber] Agrees, that, any and all controversies which may arise between [PaineWebber], any of [PaineWebber's] employees or agents and Client concerning any account, transaction, dispute or the construction, performance or breach of this or any other agreement, whether entered into prior, on or subsequent to the date hereof, shall be determined by arbitration."
(Bold typeface original.) Although Brown does not challenge the application of the Federal Arbitration Act to the provision in the master account agreement PaineWebber contends is binding, and although he does not deny that the claims included in his action otherwise would have been covered under the terms of the arbitration provision, Brown testified twice, under oath — once by affidavit, and once by deposition — that he did not receive the July 3, 2000, negative consent letters, the master account agreement, or the disclosure brochure. Brown, therefore, argues that an arbitration agreement never existed between him and PaineWebber. The trial court agreed with him, but for the reasons we will state in this opinion, we believe that Brown received the master account agreement and notice of the arbitration clause contained in that document, and that his continuation of his relationship with PaineWebber precludes his denial of acceptance of the terms of the PaineWebber agreement, which unambiguously covers preexisting disputes.
 I.
PaineWebber relies on several documents in support of its argument that Brown should be compelled to arbitrate his claims against it. First, PaineWebber contends that on July 3, 2000, it sent materials to Brown notifying him that his J.C. Bradford accounts were being transferred to PaineWebber and that they would become PaineWebber accounts; PaineWebber says that included in that mailing was a master account agreement, which contained an arbitration clause PaineWebber contends is applicable to Brown's accounts with PaineWebber. *Page 414 
However, PaineWebber argues, even if Brown did not receive the notices PaineWebber says it sent, the arbitration agreement contained in the brokerage agreement Brown entered into when he opened his brokerage account with J.C. Bradford, under the laws of merger of corporations, was binding on Brown even after his accounts were transferred to PaineWebber and could be enforced. PaineWebber also argues that "even if [this] Court were to credit Brown's denial that he received the July 3, 2000 mailings, he unquestionably was aware of the terms of the PaineWebber account agreement as of May 2002, when [PaineWebber] filed its motion to stay proceedings pending arbitration."
As we noted earlier, Brown makes two basic arguments in support of the trial court's order refusing to compel arbitration: (1) he denies that he received from PaineWebber either a copy of the negative consent letters, the disclosure brochure, or the master account agreement; and (2) that the brokerage agreement entered into between Brown and J.C. Bradford, on which PaineWebber relies in part, required that any modification to the agreement be in writing and signed by an officer of J.C. Bradford and the agreement was not so modified.
 II.
The trial court, after considering the documentary evidence submitted and the arguments of the parties, found that "[t]here was no merger whereby [J.C. Bradford], as a legal entity, ceased to exist and the rights and powers of [J.C. Bradford] passed to Defendant [PaineWebber]"; rather, "[J.C. Bradford]'s contract rights, including its rights under the arbitration provisions of its customer account agreements, were unaffected by the merger, that is, the merger did not cause those rights to be transferred to Defendant [PaineWebber], which was not a party to the merger."
We believe that the trial court erred, and we agree with PaineWebber that Brown's contention that he was unaware of the existence of the arbitration agreement when the transactions made the basis of this action took place is without merit. Although Brown denies that he received the materials allegedly sent to him by PaineWebber, the record affirmatively shows that Brown continued his brokerage relationship with PaineWebber not only after the securities transactions made the basis of this action took place, but even after PaineWebber moved to compel arbitration. Not only did he continue to maintain his accounts at PaineWebber, but he also instructed PaineWebber representatives to sell securities that were being held in those accounts. Because of these facts, it appears that Brown takes inconsistent positions. He alleges in his complaint that PaineWebber owed him a duty to provide reliable information and that PaineWebber owed him a duty to place his assets in suitable investments, and he sought damages arising out of PaineWebber's alleged breach of those duties. Nevertheless, in opposition to PaineWebber's motion to compel arbitration, he denied the existence of any contractual relationship between him and PaineWebber from which such a duty could derive. This he cannot do.
This Court has held that a person who continues a business relationship after receiving notice of an arbitration provision in the contract governing that relationship implicitly consents to arbitrate any dispute that falls within the scope of the agreement. SouthTrust Bank v. Williams, 775 So.2d 184, 189-91
(Ala. 2000) (holding that a bank customer agreed to arbitrate any dispute with the bank when the customer continued to use his checking account after *Page 415 
receiving notice from the bank that the bank had modified the account agreement to incorporate an arbitration provision).
Based on the foregoing, we are of the opinion that Brown cannot confine the analysis of whether an agreement to arbitrate existed to the point when the transactions made the basis of this action took place. His continuation of the relationship with PaineWebber after those transactions precludes his denial of acceptance of the terms of the PaineWebber arbitration clause that is a part of the master account agreement and which unambiguously covers preexisting disputes. Under these circumstances, the factual dispute over whether he received the negative consent letters is not material to a resolution of this appeal, and we find no need to discuss that issue or any of the other issues presented by this appeal.
REVERSED AND REMANDED.
HOUSTON, SEE, LYONS, BROWN, HARWOOD, and STUART, JJ., concur.
JOHNSTONE, J., dissents.