PER CURIAM.
Wells Fargo Bank, N.A. (“Wells Fargo”), and Teresa Grier appeal from the judgment of the Tallapoosa Circuit Court denying their motion to compel John Robert Chapman, Jr. (“Chapman”), individually and as administrator of the estate of Margaret McCall Chapman (“the estate”), to arbitrate the claims brought against Wells Fargo and Grier arising out of the “cashing in” of a certifícate of deposit (“CD”) on April 2, 2009, and the death of Margaret McCall Chapman (“Maggie”) on April 2 or 3, 2009.
In May 2003, Maggie, who was then approximately 15 years old, opened a checking account (“the account”) at what was then SouthTrust Bank (“SouthTrust”). The account was a “multiple-party with survivorship” account, with Chapman, Maggie’s father, designated as the other party to, and other authorized signer on, the account. Both Maggie and Chapman signed the signature card, with Maggie also signing an Internal Revenue Service (“IRS”) certification on the signature card. The signature card contained, in pertinent part, the following deposit agreement:
“I/We hereby authorize each person whose name appears above to transact business with this account in writing, by telephone, in person, by telegram, by telex, and by means of any automated teller machine, point of sale terminal, or other electronic device. I/We acknowledge receipt of the Bank’s Rules and Regulations Governing Deposit Accounts and its Schedule of Services and Service Charges, and I/we acknowledge that we received a copy of the Bank’s Schedule of Funds Availability before signing this agreement. I/We agree to be bound by such Regulations and Schedule and all amendments made to either of them from time to time upon notice to any one of the persons signing above, each of whom is hereby designated as agent for the others in connection with all matters concerning this account.”
The arbitration agreement contained in the SouthTrust Rules and Regulations Governing Deposit Accounts (“account regulations”) in effect at the time Maggie and Chapman opened the account read, in part:
“34. ARBITRATION OF DISPUTES. BY OPENING OR MAINTAINING YOUR ACCOUNT, YOU AND WE AGREE THAT ANY CONTROVERSY BETWEEN YOU AND US, OR BETWEEN YOU AND ANY OF OUR OFFICERS, EMPLOYEES, AGENTS, OR AFFILIATED ENTITIES, THAT ARISES OUT OF OR IS RELATED TO YOUR ACCOUNT, OR ANY PRODUCT OR SERVICES RELATED TO YOUR ACCOUNT, OR ANY ADVERTISEMENT, INDUCEMENT, DISCLOSURE OR AGREEMENT RELATED TO YOUR ACCOUNT OR ANY SUCH PRODUCT OR SERVICES, OR THAT QUESTIONS THE ENFORCEABILITY OF THIS AGREEMENT TO ARBITRATE, OR ANY RELATIONSHIP THAT RESULTS FROM ANY OF THE FOREGOING, WHETHER THE CONTROVERSY IS NOW EXISTING OR ARISES IN THE FUTURE AND WHETHER BASED ON CONTRACT, IN TORT, OR ON ANY OTHER LE *777 GAL THEORY, INCLUDING CLAIMS OF FRAUD, SUPPRESSION, MISREPRESENTATION AND FRAUD IN THE INDUCEMENT (INDIVIDUALLY AND COLLECTIVELY, ANY ‘CLAIM’), WILL BE SETTLED BY BINDING ARBITRATION UNDER THE FEDERAL ARBITRATION ACT (‘FAA’), 9 U.S.C. SECTION 1ET SEQ....
“The arbitration will be administered by the American Arbitration Association (‘AAA’) under its Arbitration Rules for the Resolution of Consumer-Related Disputes....
“.... Any question regarding whether a particular dispute is subject to arbitration, including claims of unconscionability, will be decided by the arbitrator. ...”
Over the following years, changes were made to the account regulations governing the account and SouthTrust Bank merged with Wachovia Bank (“Wachovia”), which instituted its own regulations regarding the account. All the SouthTrust and Wa-chovia account regulations contained arbitration clauses, although they were not identical. Maggie continued to utilize the account until the date of her death on April 2 or 3, 2009.
Upon Maggie’s death, Chapman became the owner of the account by virtue of the survivorship provisions of the account. At some point after Maggie’s death, Wachovia merged with Wells Fargo. As of June 2011, the account remained open.
According to the complaint, Chapman held a CD in his name as “custodian” for Maggie with Wachovia at a branch in Alexander City. On April 2, 2009, Chapman went to the Wachovia branch in Alexander City between 10:30 a.m. and 11:15 a.m. During that visit, Chapman spoke with Grier, whom he informed that the purpose of his visit was to be certain that Maggie could not access or receive the funds held in the CD. Grier represented to Chapman that because he was the custodian of the CD, Maggie could not access the funds held in the CD without his signature. Chapman advised Grier or other agents of Wachovia that “payment of the CD funds [to Maggie] would result in Maggie being placed in imminent danger of suffering bodily injury and/or death.” Chapman then requested that Maggie’s name be removed from the CD entirely, so as to prevent her access to the funds; Grier represented that Maggie’s name had been removed from the CD and that no signature was necessary to effect the removal of Maggie’s name from the CD. However, despite those assurances, at approximately 1:58 p.m. on that same day, Maggie, who was then 21 years old, and another person visited the Wachovia branch in Auburn, Maggie redeemed the CD, and the bank paid her $11,224.17 in cash.
After Maggie received the money, she and others used some of the funds to purchase illegal narcotic drugs, which they consumed together. The remaining funds were taken to Birmingham to be used by others to purchase a vehicle, while Maggie remained in Auburn. Maggie died from a drug overdose on April 2 or 3, 2009.
Chapman, individually and as the administrator of Maggie’s estate, sued Wells Fargo and Grier, among others, alleging various theories of recovery. Against Wells Fargo, the complaint asserted claims of wrongful death, breach of contract, fraudulent misrepresentation, fraudulent suppression, and negligence/wantonness. Against Grier, the complaint asserted the following claims: fraudulent misrepresentation, fraudulent suppression, and negligence/wantonness.
Wells Fargo and Grier moved to compel arbitration of the claims against them. They produced copies of several account regulations that had governed the account *778 at SouthTrust, Wachovia, and Wells Fargo between 2003 and 2010. Each of those account regulations contains an arbitration clause. Wells Fargo also presented the affidavit testimony of Timothy O. Merck, a vice president of Wells Fargo. In his two affidavits, Merck testified that Wells Fargo is a National Banking Association, that “it is regulated by the Federal Reserve Board,” that “its deposits are insured by the Federal Deposit Insurance Corporation,” that “it has depositors throughout the United States,” that “its accounts are not segregated by state,” and that “the pool of money used to pay account holders is derived from a pool of funds that regularly flows across state lines.” Merck further stated that Wells Fargo was the legal successor to both SouthTrust and Wacho-via, which had succeeded SouthTrust.
Chapman, on his own behalf and on behalf of the estate, filed a response in opposition to Wells Fargo and Grier’s motion in which he argued that Wells Fargo and Grier had not offered evidence of a contract calling for arbitration, that no agreement governing the CD at issue had been offered as evidence, and that Wells Fargo and Grier had not provided evidence indicating that Maggie or Chapman had ever received notice of the mergers of the respective banks or of changes to the account regulations governing the account. Chapman also argued that Grier, as an employee of Wells Fargo, was not entitled to rely on any arbitration agreement that might exist. Chapman did not provide the court any evidence in support of his opposition to the motion to compel arbitration.
The trial court denied Wells Fargo and Grier’s motion to compel arbitration. Wells Fargo and Grier appeal, arguing that they met their prima facie burden of proving the existence of a contract calling for arbitration and proving that the contract involved a transaction affecting interstate commerce and that Chapman and the estate failed to prove any applicable defenses to the arbitration agreement. We affirm the judgment in part, reverse it in part, and remand the cause with instructions.
“ ‘[T]he standard of review of a trial court’s ruling on a motion to compel arbitration at the instance of either party is a de novo determination of whether the trial judge erred on a factual or legal issue to the substantial prejudice of the party seeking review.’ Ex parte Roberson, 749 So.2d 441, 446 (Ala.1999). Furthermore:
“‘A motion to compel arbitration is analogous to a motion for summary judgment. TranSouth Fin. Corp. v. Bell, 739 So.2d 1110, 1114 (Ala.1999). The party seeking to compel arbitration has the burden of proving the existence of a contract calling for arbitration and proving that that contract evidences a transaction affecting interstate commerce. Id. “After a motion to compel arbitration has been made and supported, the burden is on the non-movant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question.” ’
“Fleetwood Enters., Inc. v. Bruno, 784 So.2d 277, 280 (Ala.2000) (quoting Jim Burke Auto., Inc. v. Beavers, 674 So.2d 1260, 1265 n. 1 (Ala.1995) (emphasis omitted)).”
Vann v. First Cmty. Credit Corp., 834 So.2d 751, 752-53 (Ala.2002). Because motions to compel arbitration are analogous to summary-judgment motions and because our review is de novo, we will consider the arguments made by Chapman regarding whether Wells Fargo and Grier presented evidence of the existence of a contract requiring arbitration and whether Chapman presented sufficient evidence of defenses to the validity of any such con *779 tract to determine whether the trial court erred in denying Wells Fargo and Grier’s motion to compel arbitration.[1]
Chapman contends that he did not sign the original SouthTrust signature card and that he is therefore not bound by the arbitration agreement in the original SouthTrust account regulations. However, our examination of the document reveals that he and Maggie signed in the signature section and that Maggie signed the IRS tax certification, because her Social Security number was the one used to establish the account. Thus, we reject any contention by Chapman that he is not bound by the arbitration agreement in the original SouthTrust account regulations.
Chapman next argues that Wells Fargo and Grier failed to prove that Maggie and Chapman were provided with the SouthTrust account regulations and, therefore, that the trial court properly denied Wells Fargo and Grier’s motion to compel arbitration. However, the SouthTrust signature card that both Maggie and Chapman signed stated that they “acknowledged receipt of the Bank’s Rules and Regulations Governing Deposit Accounts” and that they “agree to be bound by such Regulations -” The fact that the account regulations were part of the contract between Maggie and Chapman and South-Trust was therefore evident; Maggie and Chapman acknowledged receipt of those regulations, and Chapman cannot now claim ignorance of them. See Tyler v. Williams, 963 So.2d 76, 78 (Ala.2007) (holding that a customer who signed directly above a provision notifying her that terms and conditions of the agreement were on the reverse side of the document could not argue that she had not assented to those terms). Thus, we find no merit to the argument that Wells Fargo and Grier did not prove that Maggie and Chapman had notice of the arbitration provision in the SouthTrust account regulations.
Chapman also challenges the validity of the arbitration agreement on the ground that Maggie’s minority at the time she opened her SouthTrust account prevented her from being able to contract. Certainly, Maggie’s contract with South-Trust was voidable because she executed it when she was a minor and it was not a contract for “necessaries.” S.B. v. Saint James Sck, 959 So.2d 72, 96 (Ala.2006); see also Williams v. Baptist Health Sys., Inc., 857 So.2d 149,151 (Ala.Civ.App.2003). Maggie was entitled to disaffirm her contract during her minority or within a reasonable time after she reached the age of majority. Standard Motors, Inc. v. Raue, 37 Ala.App. 211, 65 So.2d 829 (1953). However, the record discloses no evidence indicating that Maggie at any time disaf-firmed her contract with SouthTrust or with its successor, Wachovia. The account was in use up until her death and has been maintained since her death by Chapman, who became to the owner of the account via survivorship rights. Maggie’s minority at the time she opened the SouthTrust account did not serve to render the original arbitration agreement invalid.
Chapman appears to further argue in his brief on appeal that Maggie could not have disaffirmed the contract with SouthTrust because its merger with Wachovia occurred before she reached the age of majority; we fail to see the legal importance of this fact. As noted above, Maggie could have disaffirmed her contract with SouthTrust while she was a minor; she did not. She also failed to disaffirm the contract at any time after the merger with Wachovia or after she reached the age of majority. As we ex- *780 plain below, we agree with Chapman that Wells Fargo and Grier have failed to prove that Maggie and Chapman were provided notice of the amendments to the account regulations that were adopted between 2003 and 2010. Because we conclude neither that Chapman nor Maggie was bound by any of the amendments to the account regulations, we will not accept Chapman’s argument that the SouthTrust arbitration agreement was superseded by the Wacho-via account regulations and that, therefore, Maggie could not have been bound by either set of account regulations. A party may not accept only those portions of a contract he or she finds advantageous to his or her position and reject others; if the amendments to the regulations did not apply to Maggie, the SouthTrust arbitration agreement remains in effect. Value Auto Credit, Inc. v. Talley, 727 So.2d 61, 62 (Ala.1999) (quoting J. Calamari & J. Perillo, The Law of Contracts § 8-4, at 310 (3d ed.1987)) (stating that “ ‘[t]he infant is not entitled to enforce portions that are favorable to him and at the same time disaffirm other portions that he finds burdensome’ ”); Delta Constr. Corp. v. Gooden, 714 So.2d 975, 981 (Ala.1998) (stating that a party is not entitled “to arbitrarily pick and choose between provisions in the contract .... ”).
As support for the trial court’s denial of Wells Fargo and Grier’s motion to compel arbitration, Chapman further suggests that Wells Fargo and Grier failed to prove the existence of a valid arbitration agreement because they did not prove that Maggie had received notice of the changes to the account regulations between 2003 and 2009 or of the merger between SouthTrust and Wachovia. Based on that argument, Chapman contends that Maggie could not have been bound by the arbitration agreements contained in the various account regulation changes and in the Wachovia account regulations, to which, Chapman argues, Maggie never assented. Likewise, Chapman appears to argue that he received no notice of the Wells Fargo merger and its account regulations, so he cannot be bound by the arbitration agreement in the account regulations as amended by Wells Fargo. As Wells Fargo and Grier point out, the various account regulations indicate that changes may be made in the account regulations from time to time; as Chapman points out, the exact wording and requirements of each of the account regulations varies, but they all require that some form of notice of the changes be provided to the account holder.
Our supreme court has stated that “[ajmendments to the conditions of unilateral-contract relationships [like those between a bank and its customers] with notice of the changed conditions are not inconsistent with the general law of contracts.” SouthTrust Bank v. Williams, 775 So.2d 184, 190-91 (Ala.2000). Based on that principle, the Williams court concluded that such amendments, when promulgated with the requisite notice, are impliedly assented to by the customer when the customer holds open his or her account after notice of the amendments. Williams, 775 So.2d at 191; see also UBS PaineWebber, Inc. v. Brown, 880 So.2d 411, 414 (Ala.2003) (relying on Williams for the principle that “a person who continues a business relationship after receiving notice of an arbitration provision in the contract governing that relationship implicitly consents to arbitrate any dispute that falls within the scope of the agreement”). Similarly, in Ex parte Rush, 730 So.2d 1175, 1178 (Ala.1999), our supreme court held that a signature to an arbitration agreement is not required if mutual assent to the terms of the contract containing the agreement may be inferred from other conduct of the parties, including, specifically, a party’s having been mailed the contract, having received the contract, having been *781 designated as a party to the contract, and having benefited from or having relied upon other terms of the contract.
However, the record in each of those cases contained evidence indicating that notice of the provision in question had been provided to each party. In Williams, SouthTrust had presented evidence indicating that its customers had been given notice of the amendments to its regulations in January 1997 when SouthTrust “enclos[ed] in each customer’s ‘account statement’ a complete copy of the regulations, as amended.” Williams, 775 So.2d at 187. In Brown, UBS PaineWebber, Inc. (“PaineWebber”), provided a letter that, it averred, it had sent to Brown, informing him that his account would be automatically transferred to PaineWebber due to PaineWebber’s acquisition of J.C. Bradford & Co., L.L.C. Brown, 880 So.2d at 413. PaineWebber presented evidence indicating that it had also enclosed with its letter a disclosure brochure informing Brown that, upon the transfer of his account, that account would be governed by the PaineWebber master account agreement, which, PaineWebber contended, had also been provided to Brown and included an arbitration provision. Id. Likewise, the evidence in Ex parte Rush demonstrated that the Rushes had been mailed and had received the Termite Protection Plan containing the arbitration agreement at issue. Ex parte Rush, 730 So.2d at 1178.
The record in the present case lacks any evidence indicating that notice of the various changes in the account regulations over the years or notice of the mergers between SouthTrust and Wachovia and Wachovia and Wells Fargo were provided to Maggie or to Chapman.[2] The two affidavits in the record from Merck do not include testimony that notice of the amendments to the various account regulations was properly provided to Maggie and Chapman, as required by those account regulations. Thus, we cannot agree that Wells Fargo and Grier proved that Wells Fargo’s arbitration agreement governs this case by virtue of the amendments to the account regulations since 2003. However, Chapman, individually, and in his capacity as administrator of the estate, because, insofar as he is advancing any claims that belonged to Maggie while she was alive, he stands in Maggie’s shoes, see SouthTrust Bank v. Ford, 835 So.2d 990, 993-94 (Ala. 2002), is bound by the original SouthTrust arbitration agreement.
We next consider whether Chapman is required to submit the wrongful-death claim to arbitration under the South-Trust arbitration agreement. Chapman argues that, pursuant to Entrekin v. Internal Medicine Associates of Dothan, P.A., 764 F.Supp.2d 1290, 1294-96 (M.D.Ala. 2011), the arbitration agreement does not apply to the wrongful-death claim because that claim was not Maggie’s claim to assert, and, thus, she could not agree to arbitrate that claim. The Entrelcin court based its decision that an arbitration agreement entered into by a decedent could not be used to compel arbitration of a wrongful-death claim based on his death on its observation that, under Alabama law, a wrongful-death claim is a claim belonging to a decedent’s personal representative, not to the decedent, because it comes into being only after death. Entre-kin, 764 F.Supp.2d at 1295; see also *782 Henderson v. MeadWestvaco Corp., 23 So.3d 625, 629 (Ala.2009) (quoting Ivey v. Wiggins, 276 Ala. 106, 108, 159 So.2d 618, 619 (1964)) (explaining that Ala.Code 1975, § 6-5-410(a), the wrongful-death statute, “ ‘creates a distinct cause of action which comes into being only upon death from wrongful act’ ”), and Ivey v. Wiggins, 276 Ala. at 108, 159 So.2d at 620 (“The chose in action here never did belong to the intestate; the statute creates it only upon his wrongful death.”). However, our supreme court has enforced arbitration agreements in cases involving wrongful-death claims when the personal representatives had themselves been signatories to the arbitration agreements. See Carraway v. Beverly Enters. Alabama, Inc., 978 So.2d 27 (Ala.2007); and Briarcliff Nursing Home, Inc. v. Turcotte, 894 So.2d 661 (Ala.2004).
We assume that Chapman advances this argument because Chapman contends that he did not sign the SouthTrust signature card and that he is therefore not bound by the SouthTrust arbitration agreement. We have concluded that the evidence establishes that Chapman did sign the signature card, however; therefore, we need not determine whether Carraway and Tur-cotte stand for the proposition that a decedent may agree to arbitrate a wrongful-death claim arising from his or her own death. Instead, we may rely on Chapman’s being a signatory to the SouthTrust arbitration agreement to compel him to arbitrate the wrongful-death claim like the personal representatives in Carraway and Turcotte.[3]
Chapman further argues that Wells Fargo and Grier failed to provide an arbitration agreement pertaining specifically to the CD at issue. This argument is essentially one that the dispute regarding the CD is not within the scope of the arbitration agreement. Typically, once the movant has met its burden of proof, “ ‘ “the burden is on the non-movant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question.” ’ ” Vann, 834 So.2d at 753 (quoting Fleetwood Enters., Inc. v. Bruno, 784 So.2d 277, 280 (Ala.2000), quoting in turn Jim Burke Auto., Inc. v. Beavers, 674 So.2d 1260, 1265 n. 1 (Ala.1995)). In this case, however, the agreement indicated that the “arbitration will be administered by the American Arbitration Association (‘AAA’) under its Arbitration Rules for the Resolution of Consumer-Related Disputes.” In support of their motion to compel arbitration, Wells Fargo and Grier offered evidence indicating that, pursuant to the applicable arbitration rules adopted by the American Arbitration Association (“AAA”), the arbitrator was empowered to “rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.” Wells Fargo and Grier argue that, as a result, the issue of arbitrability is for the arbitrator, rather than the trial court, to resolve.
In CitiFinancial Corporation, L.L.C. v. Peoples, 973 So.2d 332 (Ala.2007), our supreme court addressed an almost identical *783 issue. Borrowers brought an action against certain lenders alleging wrongful foreclosure and seeking to have the foreclosure deed declared void. Id. at 334. The lenders moved to compel arbitration, the trial court denied that motion, and the lenders appealed. Id. Our supreme court noted that language in the arbitration agreement at issue indicated that the arbitration agreement incorporated “the Commercial Rules of the [AAA].” Id. at 339. The supreme court further noted that those “conferr[ed] authority to decide [ar-bitrability] issues on the arbitrator.” Id. Our supreme court held that “an arbitration provision that incorporates rules that provide for the arbitrator to decide issues of arbitrability clearly and unmistakably evidences the parties’ intent to arbitrate the scope of the arbitration provision.” Id. at 340. The supreme court, therefore, concluded that the trial court had erred in denying the lenders’ motion to compel arbitration. Id.
By agreeing to SouthTrust’s account regulations, Maggie and Chapman agreed that the applicable arbitration rules of the AAA would govern any of their disputes with SouthTrust and its successor, Wells Fargo, and, pursuant to those rules, they agreed to submit any disputes as to the arbitrability of a particular claim to the arbitrator for resolution. Thus, that threshold question is not for the trial court to decide but, rather, is an issue for the arbitrator to resolve.
Chapman makes one additional argument regarding the motion to compel insofar as it relates to the claims asserted against Grier. He argues that Grier, as a nonsignatory to the arbitration agreement, is not entitled to enforce the arbitration agreement. We note that the SouthTrust arbitration agreement includes within its scope disputes between account holders and employees. Grier was employed by Wachovia on April 2, 2009, and, based on the allegations of the complaint, she was also employed by Wells Fargo at some point; the record does not reflect whether she was employed by SouthTrust. However, under the terms of the SouthTrust arbitration agreement, which continues in effect in light of the failure of proof regarding whether Maggie and Chapman received notice of the amendments to the account regulations or of the mergers between SouthTrust and Wachovia and Wa-chovia and Wells Fargo, any claims against Grier brought by Chapman, individually or on behalf of the estate, would be arbitrable if she were considered to be the employee of SouthTrust’s successor bank, Wachovia.
In any event, our supreme court has long held that a nonsignatory employee is entitled to rely on the arbitration agreement of his or her employer when the employee is sued for conduct occurring in the line and scope of his or her employment. See Monsanto Co. v. Benton Farm, 813 So.2d 867, 874 (Ala. 2001); Ex parte Gray, 686 So.2d 250, 251 (Ala.1996) (relying on Paine, Webber, Jackson & Curtis, Inc. v. McNeal, 143 Ga.App. 579, 581, 239 S.E.2d 401, 404 (1977)). Chapman appears to argue, without citation to any authority, that Grier was acting outside her capacity as an employee of Wachovia when she spoke with Chapman on April 2, 2009, thus preventing her from enforcing the arbitration agreement. Specifically, Chapman states that “[i]t is difficult to comprehend how making various misrepresentations which eventually led to the death of another could possibly be within the line and scope of one’s employment with a bank.” We disagree with the argument advanced by Chapman that Grier’s conduct was not “within the line and scope of [her] employment.” Grier’s alleged misstatements to Chapman regarding the availability of the CD funds to Maggie and any actions Grier took or did *784 not take to ensure that only Chapman could access the CD funds were clearly in the scope of her employment with Wacho-via and concerned the business of her employer; based on the allegations contained in the complaint, nothing Grier allegedly said or did could be said to have “emanated from wholly personal motives of [Grier] and was committed to gratify wholly personal objectives or desires of [Grier].” Hendley v. Springhill Mem’l Hasp., 575 So.2d 547, 550 (Ala.1990). Although in the complaint Grier is described as having acted “individually and/or in her capacity as agent, servant, and/or employee of Wells Fargo,” no factual allegation or evidence in the record indicates that Grier was involved in anything but furthering Wacho-via’s business when she assisted Chapman on April 2, 2009[4] See Joe Hudson Collision Ctr. v. Dymond, 40 So.3d 704, 712 (Ala.2009) (reversing a judgment denying a motion to compel arbitration by a supervisor who had allegedly assaulted the plaintiff because the complaint described the supervisor as “acting in the line and scope of his employment”). Thus, we cannot agree with Chapman that Grier is not permitted to enforce the arbitration agreement.
Wells Fargo and Grier have demonstrated that a written arbitration agreement exists, they have provided undisputed evidence demonstrating that banking activities like those Wells Fargo engages in affect interstate commerce, and they have demonstrated that Grier is entitled to enforce the arbitration agreement. Thus, Wells Fargo and Grier met their burden on the motion to compel arbitration. Chapman has failed to demonstrate that the SouthTrust arbitration agreement was invalid. The trial court erred in denying Wells Fargo and Grier’s motion to compel arbitration, and we reverse its judgment and remand the cause for the trial court to enter an order granting the motion to compel arbitration of the claims against Wells Fargo and Grier and to either issue a stay the action against Wells Fargo and Grier pending arbitration or to dismiss the action. See Peoples, 973 So.2d at 341 (“On remand, the trial court shall grant the motion to compel arbitration and either issue a stay of these proceedings pending arbitration or dismiss the case.”); see also Johnson v. Jefferson Cnty. Racing Ass’n, 1 So.3d 960, 969-70 (Ala.2008) (discussing the trial court’s discretion regarding whether to stay or dismiss an action after compelling arbitration).
Wells Fargo and Grier further argue on appeal that the trial court erred by failing to impose the costs of this litigation on Chapman, individually and in his capacity as administrator of the estate. According to Wells Fargo and Grier, the Wells Fargo arbitration agreement requires that a party who fails to submit to arbitration after a lawful demand bears the costs and expenses, including attorney fees, incurred by the party seeking to compel arbitration. However, as we explained above, the operative arbitration agreement is the South-Trust arbitration agreement and not the Wells Fargo arbitration agreement. Thus, we cannot reverse the trial court’s judgment insofar as it refused to order Chapman to bear the costs and expenses associated with the motion to compel arbitration.
*785 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and PITTMAN, BRYAN, THOMAS, and MOORE, JJ., concur.

. On appeal, Chapman does not make any argument that the contracts containing the arbitration agreements do not involve a transaction affecting interstate commerce.

. As noted above, the various account regulations prescribed different ways of effecting notice, including mailing a copy of the amendments to the account holder or posting the amendments at a bank branch. In light of Wells Fargo and Grier's failure to present evidence indicating that notice of amendments and mergers was provided to Maggie and Chapman, we need not discuss further the various requirements of the various account regulations regarding notice.

. We note that Chapman argues that he did not sign the SouthTrust account as a personal representative or in a representative capacity. However, although the personal representatives in Carraway and Turcotte signed the arbitration agreements in some form of representative capacity, that particular fact did not appear to form the basis of the decisions to compel those personal representatives to arbitrate; to be certain, neither personal representative was a personal representative before the death of each decedent. Instead, it appears that the supreme court considered the fact that each personal representative was a signatory to the agreement to be the pivotal issue. See Noland Health Servs., Inc. v. Wright, 971 So.2d 681, 687 (Ala.2007) (explaining that the personal representatives-plaintiffs in Turcotte were signatories to the arbitration agreement).

. If, as Chapman argues, Grier’s actions were not in the scope of her employment with Wachovia, then Wells Fargo would not be responsible for Grier's alleged misrepresentations, because liability of a principal under the theory of respondeat superior is based on the requirement that the act of the employee be committed in the line and scope of his or her employment or that the act be in the furtherance of the employer’s business or that the employer participate in, authorize, or ratify the act. See Pritchett v. ICN Med. Alliance, Inc., 938 So.2d 933, 935-36 (Ala.2006).