Merrill Lynch, Pierce, Fenner Smith, Inc., and John Niedergeses (hereinafter sometimes referred to together as "Merrill Lynch") appeal from an order of the DeKalb Circuit Court denying their motion to compel arbitration of claims brought by Lotha Kilgore. We reverse and remand.
Kilgore testified by affidavit that on June 10, 1997, he sought advice from Jack Jordan, an employee of Merrill Lynch, regarding 4,218 shares of stock he had inherited from his father in the First Tennessee National Corporation. The stock certificates identified the plaintiff, his sister, and his father as joint owners. Kilgore indicated that he wanted to have his deceased father's name removed from the stock certificates and to have the certificates reissued solely in his name. Jordan told Kilgore that he would reissue the certificates in his name as the sole owner of the stock; he advised Kilgore that he should sell the stock after the certificates were reissued. Kilgore left the stock certificates with Jordan and orally authorized him to sell the stock. Kilgore signed nothing at this meeting. Kilgore contends that Jordan knew, but failed to advise him, that the stock was increasing in value because of rumors of a possible takeover of the First Tennessee National Corporation.
On June 12, 1997, Kilgore received a letter from Merrill Lynch advising him that Jordan was no longer employed by the company and that John Grayson would be handling his transactions in the future. Grayson telephoned Kilgore and advised him that the sale of his stock had fallen through, because the stock certificates were still in Kilgore father's name and, therefore, were not transferable. Grayson advised Kilgore that, instead of selling the stock, Merrill Lynch could open a cash management account for him and lend him up to 50% of the value of his First Tennessee stock to obviate the need to sell the stock. Kilgore told Grayson that he wanted to open such an account. At that time, Kilgore signed a Cash Management Account (CMA) agreement. Kilgore states in his affidavit that he did not receive a copy of the document after he executed it. Grayson explained to Kilgore that he could use this account like he would use a checking account and that he would receive checks and a credit card that he could use to withdraw money from the account.
Subsequently, Kilgore wrote checks on the account totalling approximately $100,000; the checks were refused for insufficient funds. When Kilgore attempted to telephone Grayson, he was advised that Grayson was no longer handling his account and that John Niedergeses was in charge of the account. Kilgore initiated a conference call with his banker and Niedergeses, during which Niedergeses assured the banker that the funds would be transferred to Kilgore's account. When the funds were not immediately transferred, Kilgore asked Niedergeses when he could write checks against the account. Niedergeses told Kilgore that he would be able to obtain the entire face value of the stock soon, because the stock was going to be sold. Kilgore advised Niedergeses that he had told Grayson that he did not want to sell the stock but that he instead wanted to keep the value of the stock in the CMA so that he could borrow against it. According to Kilgore, Niedergeses insisted that the stock had to be sold. Kilgore faxed a letter to Merrill Lynch, instructing it not to sell the stock. During two subsequent meetings with Niedergeses, Kilgore demanded the stock certificates and demanded that his CMA reflect the increase in the value of the stock. Niedergeses informed him that the stock was being sold and that he would have to execute the necessary documents to complete the sale of the stock if he wanted to receive any funds. *Page 10 
Kilgore sued Merrill Lynch, alleging fraud, misrepresentation, suppression, and fraudulent inducement. Kilgore argues that Merrill Lynch fraudulently induced him to sign the CMA agreement, which contained the arbitration provision, and, therefore, that the arbitration provision is unenforceable. Merrill Lynch moved to compel arbitration. The trial court denied the motion.
The CMA agreement contains a predispute arbitration agreement. The arbitration agreement in the CMA agreement reads, in part, as follows:
"AGREEMENT TO ARBITRATE CONTROVERSIES WITH [MERRILL LYNCH]
"10. *Arbitration is final and binding on the parties.
 "* The parties are waiving their right to seek remedies in court, including the right to a jury trial.
 "* Pre-arbitration discovery is generally more limited than and different from court proceedings.
 "* The arbitrator's award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited.
 "* The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.
 "I agree that all controversies which may arise between us, including but not limited to those involving any transaction or the construction, performance, or breach of this or any other agreement between us, whether entered into prior, on or subsequent to the date hereof, shall be determined by arbitration. Any arbitration under this Agreement shall be conducted only before the New York Stock Exchange, Inc., the American Stock Exchange, Inc., or an arbitration facility provided by any other exchange, the National Association of Securities Dealers, Inc., or the Municipality Securities Rule-making Board, and in accordance with its arbitration rules then in force. . . . "
Kilgore acknowledges signing the CMA agreement; however, no representative of Merrill Lynch signed it. On the signature page the following appears above Kilgore's signature:
"BY SIGNING BELOW, I ACKNOWLEDGE:
 "1. THAT IN ACCORDANCE WITH PARAGRAPH 10 OF THE AGREEMENT I AM AGREEING IN ADVANCE TO ARBITRATE ANY CONTROVERSIES WHICH MAY ARISE WITH YOU. . . ."
In its order denying Merrill Lnych's motion to compel arbitration, the trial court wrote, in pertinent part:
 "(1) The `agreement' upon which [Merrill Lynch relies] for arbitration was not signed by [Merrill Lynch] and, therefore, is not enforceable.
 "(2) The alleged conduct of [Merrill Lynch] upon which [Kilgore] relies occurred prior to [Kilgore's] execution of the document containing the arbitration clause, and the conduct complained of did not arise out of or relate to the provisions of that instrument. (citation omitted).
 "(3) In language immediately above [Kilgore's] signature, the following appears: `THAT IN ACCORDANCE WITH PARAGRAPH 10 OF THE AGREEMENT I AM AGREEING IN ADVANCE TO ARBITRATE ANY CONTROVERSIES WHICH MAY ARISE WITH YOU." Use of the word `ADVANCE' connotes an intention that arbitration requirements apply only to future acts of the parties and should be so construed unless clearly designated otherwise as in the case of acts relating to contracts previously entered.
 "(4) Taking the language of the instrument as a whole, the parties did not intend for the arbitration provision to *Page 11 
apply to the fraudulent acts alleged to have occurred prior to [Kilgore's] execution of the agreement."
In Allied-Bruce Terminix Cos. v. Dobson, 684 So.2d 102 (Ala. 1995), we wrote:
 "`The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or like defense to arbitrability.'"
684 So.2d at 107 (quoting Moses H. Cone Memorial Hosp. v. MercuryConstr. Corp., 460 U.S. 1, 24-25 (1983)). However, we have held that a party cannot be required to arbitrate a dispute that he or she did not agree to arbitrate. See Capital Inv. Group, Inc. v.Woodson, 694 So.2d 1268 (Ala. 1997).
Merrill Lynch argues that the trial court erred in denying its motion to compel arbitration solely on the basis that no representative of Merrill Lynch had signed the CMA agreement containing the arbitration agreement. We agree.
This Court has held that the object of a signature on a contract is to show mutuality and assent, and that mutuality and assent can be manifested in ways other than a signature. SeeLawler Mobile Homes, Inc. v. Tarver, 492 So.2d 297 (Ala. 1986);Ex parte Pointer, 714 So.2d 971 (Ala. 1997). Unless required by a statute to be in writing, a contract does not have to be signed to be enforceable, so long as it is accepted and acted upon.Tarver, 492 So.2d at 304.
Although no representative of Merrill Lynch signed the CMA agreement, the absence of a signature by a Merrill Lynch employee does not invalidate the agreement. "The [Federal Arbitration Act] only requires that there be a `written provision' in a `contract;' it does not specify that a party's assent to the terms of a contract containing an arbitration provision can be evidenced only by that party's signature." Ex parte Rush, [Ms. 1980328, March 26, 1999] 730 So.2d 1175, (Ala. 1999). Conduct of one party to a contract from which the other may reasonably draw an inference of assent to an agreement is effective as acceptance. AndersonBrothers Chrysler Plymouth Dodge, Inc. v. Hadley, 720 So.2d 895
(Ala. 1998) (the failure of a party to sign a contract on a signature line next to an arbitration provision did not render the provision unenforceable). In addition, it is a general principle of contract law that when a contract is signed by a party or parties "to be charged," a contract can be enforced where the other party fails to sign the contract. See Anselmo Meat Co. v.Riley, 533 So.2d 552 (Ala. 1988).
The record indicates that Merrill Lynch provided Kilgore with the CMA agreement and that Kilgore executed it. In addition, Merrill Lynch acted in recognition of the formal agreement. Therefore, we conclude that Merrill Lynch manifested assent to the terms of the agreement, including the arbitration agreement contained therein, notwithstanding the absence of a signature by its representative. Accordingly, we conclude that the arbitration provision contained in the CMA agreement is enforceable.
Merrill Lynch also contends that the trial court erred in its statement that the conduct complained of occurred before Kilgore signed the CMA agreement and that the complained-of conduct, therefore, was not encompassed by the arbitration agreement; that agreement, the court stated, applied to "future acts of the parties." (Emphasis added.) Merrill Lynch argues that the arbitration agreement is broadly worded, "leav[ing] very little outside [its] coverage." Therefore, Merrill Lynch states, the trial court erred in denying its motion to compel arbitration.
The arbitration agreement in the CMA agreement is a broadly worded agreement, encompassing "all controversies which may arise . . ., including but not limited to *Page 12 
those involving any transaction or the construction, performance, or breach of this or any other agreement between [Merrill Lynch and Kilgore], whether entered into prior, on or subsequent to the date hereof. . . ." (Emphasis added.) Kilgore's claims are based on Merrill Lynch's alleged fraudulent inducement to persuade him to sign the CMA agreement containing the arbitration provision — a claim directed at the entire agreement. Therefore, Kilgore's claims are within the broad scope of the arbitration provision and are subject to arbitration.[1] See Investment Management Research, Inc. v.Hamilton, 727 So.2d 71 (Ala. 1999) (a claim of fraudulent inducement directed toward the entire contract was subject to arbitration); see also Merrill Lynch, Pierce, Fenner Smith,Inc. v. Kirton, 719 So.2d 201 (Ala. 1998) (the arbitration agreement encompassed controversy pending at the time the agreement was signed).
Accordingly, the order of the trial court is reversed and the case remanded.
REVERSED AND REMANDED.
Hooper, C. J., and Maddox, Houston, See, Lyons, and Brown, JJ., concur.
Johnstone, J., dissents.
[1] Kilgore argues that his intentional tort claims are not covered by the arbitration agreement. However, we have held that broad arbitration provisions encompass alleged fraudulent inducement to enter into the contract containing the arbitration clause. See Coastal Ford, Inc. v. Kidder, 694 So.2d 1285, 1286
(Ala. 1997) (the language of an arbitration clause applying to "all claims, demands, disputes, or controversies of every kind or nature that may arise . . . concerning the vehicle" was not ambiguous and was broad enough to encompass the claims at issue);Ex parte Lorance, 669 So.2d 890, 892-93 (Ala. 1995) (the language of the arbitration clause subjecting to arbitration "`any controversy or claim arising out of . . . this contract'" was broad enough to encompass the plaintiff's claim alleging fraud in the inducement of the contract).