My special writing expands upon the facts a little more than does the majority opinion in this case. In July 2002, James A. Yance, Jr., the plaintiff, sued Memberworks, Inc., alleging deceptive and fraudulent business practices and attempting to represent a class of individuals similarly situated. According to an audio-recording of a telephone conversation with Laura Chadbourne, a third-party representative of Memberworks, Yance agreed to become a member of Memberworks' Leisure Advantage Program. Yance claims not to have agreed to the membership with Memberworks or at least to have conditioned his membership in such a way as to indicate he did not agree with the entire Memberworks membership agreement; he claims that the audiotape of the telephone conversation is incomplete. Memberworks filed a motion to compel arbitration based on a clause in the Memberworks membership agreement, and Yance opposed the motion, claiming that he never agreed to the arbitration clause. The trial court denied the motion to compel arbitration, and Memberworks appeals.
The question we must answer is whether Yance should be required to arbitrate a dispute he has with Memberworks, a tele-marketing company. I would affirm the trial court's order denying the motion to compel arbitration. Therefore, I dissent.
Yance dialed a toll-free telephone number to order a sporting knife he had seen advertised on television. Memberworks was not the seller of the knife; the seller was a third party that had agreed with Memberworks to market Memberworks' Leisure Advantage program. The operator, after she had taken Yance's credit-card number for the purchase of the knife and after that purchase was concluded, presented the following Memberworks sales message:
 "Memberworks Representative: OK, for placing your order today, we are sending you a risk-free 30-day membership to Leisure Advantage and that is a service offering reward savings from leading stores such as Kmart, The Sports Authority, Barnes and Noble and Foot Locker, plus up to 50% off hotels, skiing and more. Now, best of all just for trying the program you can receive a valuable discount golf directory and a membership card which gives you up to 50% off at over 2,000 golf courses. Now, after thirty days, the service is extended to a full year for just $7.00 a month billed annually in advance to the credit card you are using today. Now, if you decide the program is not for you, just call the toll-free number in your kit in the first 30 days and you won't be billed, so look for that kit in the mail — okay?
"Yance: Okay."
Yance did not call the toll-free number provided in the kit to cancel his membership, and his credit card was charged $84 in 2000, as the telephone operator stated that it would. Yance, claiming that he thought the mailing from Memberworks containing the membership kit looked like junk mail, did not read the agreement containing the arbitration clause that was included in the membership kit, nor did he cancel his participation in the program within 30 days of receiving the kit. However, there existed several ways a member of Memberworks could exercise membership privileges and obtain a discount on various purchases: by returning a postage-paid card, by calling Memberworks' toll-free telephone number, by mentioning *Page 946 
membership in Leisure Advantage to a vendor, or by going to a special Web site address. Yance never used the service in any of these ways in 2000 or 2001, and his credit card was charged $99.95 for 2001. Yance never used the service in 2002, and his credit card was charged $119.95 for 2002. Indeed, Yance never acted affirmatively to use the services provided by Memberworks at all.
In June 2002, Yance's wife saw the charge on the credit-card bill for $119.95 and brought it to Yance's attention. Yance telephoned Memberworks and canceled his membership, and Memberworks refunded Yance's credit card not only the $119.95 for that year as called for in the agreement, but also $99.95 for 2001 and $84 for 2000. Yance filed this action on July 2, 2002, challenging "the scheme" by which Memberworks sells memberships in its Leisure Advantage program and seeking certification of a class. On August 12, 2002, Memberworks removed this action to federal court. The federal court remanded it to state court on November 15, 2002. On December 10, 2002, Memberworks filed in the state court a motion to stay proceedings and to compel arbitration. On May 8, 2003, the trial court entered a memorandum opinion and order denying Memberworks' motion.
We apply the following standard of review in such a case:
 "We review de novo a trial court's ruling on a motion to compel arbitration. Green Tree Fin. Corp. v. Vintson, 753 So.2d 497, 502 (Ala. 1999). Initially, the party seeking to compel arbitration must prove 1) the existence of a contract calling for arbitration, and 2) that the contract `is "a contract evidencing a transaction involving commerce" within the meaning of the Federal Arbitration Act (FAA).' Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 53, 123 S.Ct. 2037, 2038 (2003) (quoting 9 U.S.C. § 2). `[A]fter a motion to compel arbitration has been made and supported, the burden is on the non-movant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question.' Jim Burke Auto., Inc. v. Beavers, 674 So.2d 1260, 1265 n. 1 (Ala. 1995)."
Hudson v. Outlet Rental Car Sales, Inc., 876 So.2d 455, 457
(Ala. 2003).
Like the trial court in this case, I fail to find the necessary meeting of the minds for the formation of a contract between Yance and Memberworks. If there was no contract at all, then we need not address much of Memberworks' later arguments as to why the trial court erred in not granting its motion to compel arbitration. Memberworks' arguments are dependent upon the existence of a contract between it and Yance.
Memberworks first argues that Yance did in fact assent to the membership agreement including the arbitration agreement when he responded with "Okay" during the telephone conversation with the third-party telemarketer, who was acting as Memberworks' representative. Memberworks states that a contract need not be signed to prove mutuality of acceptance[5] and that acceptance of an offer can be manifested in several ways; it cites the following cases in support of that argument.
In Merrill Lynch, Pierce, Fenner, Smith, Inc. v. Kilgore,751 So.2d 8 (Ala. 1999), although Merrill Lynch did not sign the agreement containing the arbitration *Page 947 
agreement, it engaged in acts involving Kilgore's account evidencing its mutual assent to the terms of the agreement. This Court stated:
 "Conduct of one party to a contract from which the other may reasonably draw an inference of assent to an agreement is effective as acceptance. Anderson Brothers Chrysler Plymouth Dodge, Inc. v. Hadley, 720 So.2d 895 (Ala. 1998) (the failure of a party to sign a contract on a signature line next to an arbitration provision did not render the provision unenforceable). In addition, it is a general principle of contract law that when a contract is signed by a party or parties `to be charged,' a contract can be enforced where the other party fails to sign the contract. See Anselmo Meat Co. v. Riley, 533 So.2d 552 (Ala. 1988)."
751 So.2d at 11. Examples of the acts undertaken by Merrill Lynch manifesting assent to the agreement were managing Kilgore's account and stating an intent to sell the stock in Kilgore's account.
The language in Merrill Lynch stating that conduct can substitute for a signature as acceptance of the terms of a contract is found in Ex parte Rush, 730 So.2d 1175 (Ala. 1999). In that case, the Rushes claimed they had never signed an agreement containing an arbitration clause, yet they had accepted services provided by Terminix International, Inc., the party seeking to arbitrate the claims, and had paid bills submitted by Terminix with respect to termite-infestation prevention and termite extermination. In that opinion, this Court quotedHardwood Package Co. v. Courtney Co., 253 F. 929, 930 (4th Cir. 1918):
 "`[I]t is well settled that if the minds of contracting parties meet at all points, and their agreement is fully set forth in an unsigned memorandum, which they both accept as correct, a binding obligation results. . . .'"
730 So.2d at 1178 (emphasis added). Both the facts of Rush andMerrill Lynch and the legal authority cited in support of those opinions indicate that affirmative action is necessary for there to be mutual assent to the terms of a contract and for "the minds of contracting parties [to] meet at all points."
The other cases cited by Memberworks also support the proposition that a party's conduct can evidence assent to an agreement. Quality Truck Auto Sales, Inc. v. Yassine,730 So.2d 1164 (Ala. 1999) (car dealership's giving car in exchange for promise by buyer to pay is adequate evidence of acceptance of a contract between them); Anderson Bros. Chrysler PlymouthDodge, Inc. v. Hadley, 720 So.2d 895 (Ala. 1998) (evidence existed in the contract that Anderson Brothers was the other party to the agreement); SGB Constr. Servs., Inc. v. Ray SumlinConstr. Co., 644 So.2d 892 (Ala. 1994) (deliveries and invoices for the delivery tickets were evidence supporting a legal claim for payments for deliveries by foreign business); LanierWorldwide, Inc. v. Clouse, 875 So.2d 292, 296 (Ala. 2003) ("The performance of services and the monthly invoicing by Lanier evidence its assent to the terms of the Order Agreement.");Southern Foodserv. Mgmt., Inc. v. American Fid., Assurance Co.,850 So.2d 316 (Ala. 2002) (after learning of the existence of an arbitration clause, the party seeking to avoid arbitration not only failed to cancel policy but also paid premiums on policy).
None of the cases relied upon by Memberworks indicates that inaction is sufficient to evidence assent to the terms of a contract, particularly a contract one party has not read. The only affirmative action by Yance Memberworks can point to is his response of "Okay" upon originally hearing *Page 948 
the offer over the phone. Even then the evidence is equivocal because we do not have the recording of the full telephone conversation. After Yance said "Okay," he began to say something else, but the recording ends.[6] Yance, in his second affidavit, contends that he told the operator that he did not want to receive anything that would require action on his part to avoid a monetary charge. (Yance's brief, p. 4.) Memberworks moved to strike Yance's second affidavit, arguing that it contradicted his first affidavit. However, the trial court denied that motion.
Yance argues that the Memberworks representative he spoke to on the telephone never mentioned an arbitration provision; therefore, for there to be any legally binding agreement, any evidence of assent on his part must have arisen after Memberworks sent him the membership kit containing the arbitration agreement. Yance argues that, even though there were abundant affirmative acts by which he could have availed himself of the benefits of the membership kit — postage-paid cards, telephone notifications, purchases from vendors using the Leisure Advantage name, access to certain Web sites — he did not do so. Between July 14, 2000, and June 19, 2002, when Yance telephoned Memberworks to cancel his membership in the Leisure Advantage program, other than his original "Okay," he exhibited no conduct "from which [Memberworks] may reasonably draw an inference of assent to an agreement." Merrill Lynch, 751 So.2d at 11. Therefore, he argues, there existed no mutuality of assent to the terms of the agreement.
In its reply brief, Memberworks states that Yance ignores two critical facts. First, in the initial telephone conversation during which Yance apparently agreed to the offer with "Okay," the telephone representative told him that his credit card would be charged for the membership fee in the Leisure Advantage program if he did not cancel within 30 days of receiving his membership kit. Second, Memberworks argues that Yance did act affirmatively by using his credit card to pay for membership two years in a row. Yance states: "We are all so busy, and so inundated with marketing junk mail, that it would be unreasonable to hold that a consumer who does nothing has thereby agreed to every self-serving contractual proposal mailed to him in fine print by a clever marketer — especially when, as here, the consumer never utilizes the marketer's product or service and never takes any affirmative step to pay the marketer a dime." (Yance's brief, p. 10.) Memberworks argues that Yance misstates the relationship between him and Memberworks. Yance called the toll-free number to purchase a knife, and he agreed to the Memberworks offer by saying, "Okay." Otherwise, Memberworks would have never sent him a membership kit.
We do have cases in Alabama in which a customer, who did not act affirmatively, was bound by something sent to the customer by the other party. For example, we have held that customers were bound by amendments sent by banks and credit-card companies to their customers adding arbitration agreements to the existing contracts between the company and the customer. See, e.g.,Taylor v. Citibank USA, N.A., 292 F.Supp.2d 1333 (M.D.Ala. 2003); Providian Nat'l Bank v. Screws, 894 So.2d 625 (Ala. 2003); UBS PaineWebber, Inc. v. Brown, 880 So.2d 411 (Ala. 2003); Ex parte Colquitt, 808 So.2d 1018 (Ala. 2001);South-Trust *Page 949 Bank v. Williams, 775 So.2d 184 (Ala. 2000). However, in those cases, the parties had an ongoing contractual relationship with each other, and the original contracts provided notice to each party of the possibility of future amendments to those agreements and of how the customer would be notified of those amendments. In this case, there was no existing relationship between Yance and Memberworks, other than one telephone conversation between Yance and a third party who sold him a knife. That one telephone call is not such a contractual relationship that would require Yance to take special notice of a mail-out Yance claims appeared to be "junk mail." In fact, as the trial court found, it was not a contractual relationship at all. Although Yance was on notice that a package was being mailed to him, he did not deal directly with Memberworks but with a third party who was soliciting memberships on behalf of Memberworks. And the relationship certainly was not an ongoing one or one that was clearly defined by contract. Therefore, the principle stated in the cases involving amendments to existing contracts by banks and credit-card companies does not apply to Yance's situation.
The trial court agreed with Yance's argument and found that there was no evidence of a meeting of the minds. In its memorandum opinion, the trial court added that the decision by Memberworks to refund all three of Yance's credit-card charges was the "clearest evidence that there had been no meeting of the minds, and, therefore, no contract between the parties." I do not know if we should penalize a company for having a generous refund policy with respect to dissatisfied customers, but we need not rely upon that evidence. Even if Memberworks had not refunded any of Yance's credit-card charges, there is no affirmative act on Yance's part that indicates that he accepted the full contract or the arbitration agreement that was sent with the membership kit from Memberworks.
For the reasons explained in Yance's brief and in this special writing, I do not consider the evidence in Yance's case to be adequate evidence of mutual assent. Unless we adopt a policy that a solicitor can rely upon the failure of a customer to affirmatively act, even when there had existed no relationship between that customer and the solicitor before the first contact between them, we should affirm the trial court's denial of the motion to compel arbitration.
Memberworks advances several other arguments in opposition to the trial court's holding; however, those arguments all depend upon the existence of a contract between Yance and Memberworks. Therefore, because the trial court did not err in finding the evidence of a contract between Yance and Memberworks to be inadequate, I would affirm the trial court's order, and I must dissent.
[5] Of course, a statute may require a contract to be signed, or the contract itself could require a signature, before it is effective. However, neither party argues that such a requirement exists in this case.
[6] At the end of the audio-recording offered into evidence by Memberworks at the hearing on the motion to compel arbitration, Yance said, "How long. . . ." However, the recording ended before he could complete his question.